**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TRACY D. DAVIDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:13-cv-01724-TWP-TAB |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tracy D. Davidson ("Mr. Davidson") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

### I. BACKGROUND

**A. Procedural History**

On September 2, 2009, Mr. Davidson filed applications for DIB and SSI, alleging a disability onset date of January 30, 2009. His claims initially were denied on March 11, 2010, and again on reconsideration on June 14, 2010. Mr. Davidson filed a written request for a hearing. A hearing initially was held on January 27, 2012, but because Mr. Davidson's claims involve mental health impairments, the hearing was adjourned so that a psychologist could participate in the

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

proceedings. On April 10, 2012, a hearing was held before Administrative Law Judge James R. Norris (the "ALJ"). Mr. Davidson participated in the hearing and was represented by counsel. On April 13, 2012, the ALJ denied Mr. Davidson's applications for DIB and SSI. On July 25, 2013, the Appeals Council denied Mr. Davidson's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. After receiving an extension of time to file his Complaint, on October 25, 2013, Mr. Davidson filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

### B. Factual Background

At the time of his alleged disability onset date, Mr. Davidson was 48 years old, and he was 51 years old at the time of the ALJ's decision. Mr. Davidson completed schooling through the eighth grade and then later received a GED. He worked as a painter, painting the interior and exterior of homes and often carried heavy ladders and climbed up and down ladders. His work involved frequent bending, walking, and carrying. He has been unable to continue working since January 30, 2009 because of swelling, pain, and limited motion.

Mr. Davidson suffers from degenerative disc disease in the lumbar and cervical spine, degenerative joint disease in the right shoulder, depression, anxiety, and alcohol dependence. In his initial applications for DIB and SSI, Mr. Davidson sought benefits because of his degenerative disc disease and degenerative joint disease. He later added depression and anxiety to his applications. Mr. Davidson has not received mental health treatment for depression or anxiety and has only intermittently used medication.

Mr. Davidson began experiencing back, neck, and joint pain as a result of the heavy manual labor associated with being a painter. He asserts that his condition became debilitating on January 30, 2009, leading to an inability to work. The medical records indicate that Mr. Davidson began

seeking pain medication to treat his back pain before January 17, 2008. On that date, Mr. Davidson visited his family physician, Dr. Steven Gatewood ("Dr. Gatewood") at Elwood Family Practice. He complained of lower back pain and asked for a new prescription for pain medication, which he received ([Filing No. 15-7 at 69](#)). On April 3, 2008, he returned to Elwood Family Practice and was seen by Tammy Biele, a registered nurse ("Nurse Biele"). Nurse Biele noted that Mr. Davidson's mental status was intact and normal, and he showed no signs of depression or anxiety. She observed that Mr. Davidson's gait and station were normal, his head and neck had normal alignment and mobility, and his upper and lower extremities had normal stability, strength, and range of motion. She also noted that Mr. Davidson's back pain was unchanged ([Filing No. 15-7 at 65](#)). Nurse Biele added a note that Mr. Davidson came back sometime after the appointment and told her that he needed his narcotics refilled that day because he had been taking more than usual and only had a few left. Nurse Biele denied his request for an early refill ([Filing No. 15-7 at 67](#)).

On April 28, 2008, Mr. Davidson reported to Riverview Hospital's emergency room for complaints of chest pain. His physical examination and diagnostic tests were normal, but the record noted that examination of his back revealed levoscoliosis, or a spinal curve to the side ([Filing No. 15-7 at 4](#)).

As a follow-up to his hospital visit, Mr. Davidson was seen by Dr. Gatewood on June 12, 2008. Mr. Davidson denied having depression, anxiety, or any neurologic impairments. Dr. Gatewood noted that Mr. Davidson's mental status was intact and normal. Like Nurse Biele, Dr. Gatewood observed that Mr. Davidson's gait and station were normal, his head and neck had normal alignment and mobility, and his upper and lower extremities had normal stability, strength, and range of motion. He also noted that Mr. Davidson's back pain and scoliosis were unchanged. He prescribed various pain medications for Mr. Davidson ([Filing No. 15-7 at 61](#)).

3

Mr. Davidson was again seen by Dr. Gatewood on September 24, 2008. Mr. Davidson and his wife both were present at the appointment with Dr. Gatewood. They discussed their drug screenings and the fact that they had run out of their prescriptions. Ms. Davidson explained that she was out of medicine early because she had used more than she should have taken. Mr. Davidson again denied having depression, anxiety, or any neurologic impairments. Dr. Gatewood observed that Mr. Davidson's gait and station were normal, his head and neck had normal alignment and mobility, and his upper and lower extremities had normal stability, strength, and range of motion. Mr. Davidson complained of chronic back pain and claimed that he still needed pain medication. Dr. Gatewood rewrote pain medication prescriptions ([Filing No. 15-7 at 57](#)).

Mr. Davidson went to Elwood Family Practice on December 5, 2008, and was seen by Nurse Biele. This visit was for a three-month check-up and to receive a flu shot. Nurse Biele again noted that Mr. Davidson's gait and station were normal, his head and neck had normal alignment and mobility, and his upper and lower extremities had normal stability, strength, and range of motion ([Filing No. 15-7 at 53](#)). She noted that Mr. Davidson's back pain was unchanged and decreased his Lortab prescription.

On February 17, 2009, imaging of Mr. Davidson's cervical spine was taken. The imaging showed some mild and moderate degenerative changes ([Filing No. 15-7 at 2](#)). On February 24, 2009, Mr. Davidson met with Dr. Gatewood. He complained of continuing neck and back pain and numbness in his right arm. Dr. Gatewood prescribed additional medication and increased his Lortab prescription ([Filing No. 15-7 at 50](#)).

On April 23, 2009, Mr. Davidson again visited Dr. Gatewood. He complained of continuing neck and back pain. Mr. Davidson denied having neurologic symptoms, depression, or anxiety. Like in previous visits, Dr. Gatewood noted that Mr. Davidson's gait and station were

4

normal, his head and neck had normal alignment and mobility, and his upper and lower extremities had normal stability, strength, and range of motion (Filing No. 15-7 at 47). Nevertheless, Dr. Gatewood ordered an EMG test, an MRI, and an x-ray.

Nurse Biele met with Mr. Davidson on August 17, 2009. He discussed refilling his pain medication, and he was again referred to have an EMG test conducted because his condition, according to Nurse Biele, had deteriorated since his April visit with Dr. Gatewood (Filing No. 15-7 at 41).

On August 31, 2009, an electromyographic ("EMG")[2] test and nerve conduction study were completed (Filing No. 15-7 at 15). On September 8, 2009, Mr. Davidson followed up with Dr. Gatewood. His EMG test was discussed, and it was noted that the EMG test revealed right radiculopathy,[3] but because Mr. Davidson was unable to relax his muscles during the test, the EMG test results could not differentiate between a subacute or chronic radiculopathy (Filing No. 15-7 at 38). During this visit, Mr. Davidson denied having depression, anxiety, or other mental health impairments. Mr. Davidson reported neck pain and difficulty using his right arm. He also reported experiencing pain when he reached overhead with his right arm. His gait and station were normal, and neurologic results were normal and intact. He experienced decreased flexion, rotation, and bending in his neck and back. His cervical radiculopathy had deteriorated. He was recommended for an MRI and a follow up appointment with Dr. Francesca Tekula ("Dr. Tekula").

---

[2] "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction." An EMG is conducted when pain or numbness is experienced to determine how the nerves are affected. An EMG shows the level of functioning of nerves and helps find diseases that damage muscle tissue, nerves, or the junctions between nerves and muscles. *See* http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

[3] Radiculopathy is a condition resulting from a compressed nerve in the spine that causes pain, numbness, tingling, or weakness along the course of the nerve. It can occur in any part of the spine but is most common in the lower back (lumbar radiculopathy) and neck (cervical radiculopathy). It seldom occurs in the middle portion of the spine (thoracic radiculopathy). *See* http://www.medicinenet.com/radiculopathy/article.htm.

On September 15, 2009, an MRI was taken of Mr. Davidson's cervical spine. The MRI showed no fractures, but it did show right lateral disc protrusion with right foraminal narrowing and exiting nerve root compression. The MRI also showed right lateral disc bulging, osteophyte formation, and degenerative disc changes ([Filing No. 15-7 at 21](Filing No. 15-7 at 21)).

A month later, Mr. Davidson visited Elwood Family Practice to complain of his continuing neck pain and to discuss pain medication on October 14, 2009. He reported that he was still have pain in his neck and arm and that Norco was not controlling his pain. Nurse Biele noted that Mr. Davidson had decreased flexion, rotation, and bending in his neck and back. His neck pain and cervical radiculopathy had deteriorated. The medical record also noted that Mr. Davidson's mental status was intact and normal ([Filing No. 15-7 at 35](Filing No. 15-7 at 35)). His prescription for pain medication was renewed.

On October 22, 2009, Mr. Davidson presented to Dr. Tekula as recommended by Elwood Family Practice. Dr. Tekula noted that Mr. Davidson's oral steroids to treat his neck pain "have been very helpful." ([Filing No. 15-7 at 73.](Filing No. 15-7 at 73.)) His physical examination revealed normal results. Dr. Tekula reviewed the August 31, 2009 EMG test and the September 15, 2009 MRI. She opined that Mr. Davidson had cervical spondylosis with radiculopathy, but the radiculopathy was mild ([Filing No. 15-7 at 74](Filing No. 15-7 at 74)). She referred Mr. Davidson to the Riverview Pain Center to receive treatment from Dr. John Ward. She recommended injection and physical therapy.

When Mr. Davidson met with Dr. Ward in November 2009, Mr. Davidson reported a greater level of pain than he had reported to Dr. Tekula the month prior, and he claimed that some of his pain medications were not helpful. Dr. Ward noted that increasing his Norco prescription may be helpful. Dr. Ward also noted that Mr. Davidson's psychological affect was normal. Mr. Davidson's range of motion and sensation were decreased, and he experienced tender facets. But

6

his motor and reflex examinations and his gait were normal. Dr. Ward also recommended physical therapy ([Filing No. 15-7 at 75](Filing No. 15-7 at 75)).

Mr. Davidson first presented for physical therapy on December 29, 2009, and it was noted that he responded well to the treatment. A treatment plan was established, which included sessions of physical therapy twice a week for eight to twelve weeks ([Filing No. 15-7 at 78](Filing No. 15-7 at 78)). Mr. Davidson did not complete the treatment plan because he cancelled appointments, was non-compliant, and did not show up for treatments.

After Mr. Davidson had filed his applications for DIB and SSI, he was referred for a consultative evaluation with Dr. Bryan London, Ph.D. ("Dr. London") on February 10, 2010 ([Filing No. 15-7 at 89](Filing No. 15-7 at 89)). Mr. Davidson reported to Dr. London that he had difficulty with walking because of back pain but that he did not require an assistive device. He reported he could walk three to four blocks, stand for one hour, and sit for thirty minutes. Dr. London performed a psychological assessment, using various methods to determine Mr. Davidson's limitations. He noted Mr. Davidson's adequate personal hygiene and grooming, normal speech, normal thought process and content, and intact memory. Other mental status indicators were intact and within normal limits. Dr. London noted some depression and anxiety but indicated their relation to Mr. Davidson's physical pain. He assigned Mr. Davidson a global assessment of functioning score of 50.

The Disability Determination Bureau of the Social Security Administration ("State Agency") asked Mr. Davidson to attend a consultative physical examination on March 10, 2010. The examination revealed mild restriction in shoulder movement and slight reduction in range of motion. His gait and posture were normal, and his straight leg raise test was normal. There was no evidence of joint effusion, inflammation, or swelling. His neurologic tests were normal and intact.

It was observed that Mr. Davidson could bend over and squat without restrictions and sit, stand, and walk normally. He was able to perform functions with his hands and feet normally ([Filing No. 15-8 at 15](Filing No. 15-8 at 15)). State agency medical professionals Dr. J.V. Corcoran and Dr. J. Sands reviewed the evidence of record and opined that Mr. Davidson's neck and back impairments were not severe ([Filing No. 15-8 at 18](Filing No. 15-8 at 18); Filing No. [Filing No. 15-8 at 71](Filing No. 15-8 at 71)).

On March 25, 2010, an MRI was taken, which revealed mild facet changes and some disk bulging. It also showed nerve root compression ([Filing No. 15-8 at 20](Filing No. 15-8 at 20)). An April 5, 2010 EMG test of the right lower extremity provided normal results and showed no evidence of right lumbar radiculopathy or diffuse polyneuropathy. (*Id.*) Mr. Davidson's treatment notes from Central Indiana Orthopedic from April 2010 indicated that Mr. Davidson's pain did not seem to match his MRI ([Filing No. 15-8 at 23](Filing No. 15-8 at 23)).

The State Agency asked Mr. Davidson to attend another consultative physical examination on August 27, 2011. He indicated that he could walk six to eight blocks, stand for only ten minutes, climb two flights of stairs, and lift twenty pounds in either arm. His gait and station were normal. He could squat and stand normally. His examination of joints was normal, but he experienced some pain with palpation to his right shoulder. He had some limited range of motion in the right shoulder and in the cervical spine. Neurologic tests were normal ([Filing No. 15-10 at 23](Filing No. 15-10 at 23)).

Imaging of Mr. Davidson's right shoulder revealed degenerative joint disease in September 2011. He was referred to receive physical and aquatic therapy twice a week for three months. Instead of completing the therapy, Mr. Davidson was discharged in October 2011 because of non-compliance and not showing up for appointments ([Filing No. 15-12 at 76](Filing No. 15-12 at 76)).

The State Agency asked Mr. Davidson to attend a third consultative physical examination on February 14, 2012 ([Filing No. 15-12 at 114](Filing No. 15-12 at 114)). At that time, Mr. Davidson complained of

depression because of his inability to work. His posture and gait were normal and he had normal range of motion and good strength and stability in his extremities. Mr. Davidson also had normal alignment and mobility in his spine but was tender on palpation of the cervical spine. He was able to squat normally. His neurologic functions were normal.

After Dr. London performed a psychological assessment in February 2010, Dr. Stacia Hill, Ph.D. ("Dr. Hill") completed a psychiatric review technique and mental residual functional capacity assessment on February 24, 2010 ([Filing No. 15-7 at 99](Filing No. 15-7 at 99)). Dr. Hill noted that Mr. Davidson's limitations were primarily a result of his physical pain. Dr. Hill opined that Mr. Davidson had the mental capacity to perform unskilled tasks with some limitations, could relate on a superficial basis with others, and had the ability to manage the stresses of work. Dr. J. Gange, Ph.D., reviewed Dr. Hill's opinion and affirmed her assessment ([Filing No. 15-8 at 70](Filing No. 15-8 at 70)).

The State Agency referred Mr. Davidson for a second psychological evaluation on February 17, 2012 ([Filing No. 15-13 at 13](Filing No. 15-13 at 13)). Mr. Davidson's mental health impairments were attributable to his physical pain. His neurologic functions were normal. His grooming and hygiene were adequate. His memory was intact, orientation normal, and judgment normal. Mr. Davidson did appear mildly anxious.

At the administrative hearing on April 10, 2012, Mr. Davidson testified that he had not worked since January 30, 2009 because of the pain in his neck. He estimated that he could stand for five minutes, sit for twenty minutes, and walk around the block. He testified that he could lift or carry about ten to fifteen pounds. Mr. Davidson explained that his wife and sons do the household chores, and he no longer can participate in hobbies such as hunting and fishing.

As part of his daily activities, Mr. Davidson generally functions independently. He maintains personal hygiene himself but requires some help with buttoning shirts, washing his hair,

and reaching overhead. He helps take care of pets with his children. Mr. Davidson does "anything that needs to be done around the house - - because my wife is disabled. Whatever I can do." ([Filing No. 15-7 at 92](#).) He helps his children with their homework. He is able to make his own meals, cook, and use the microwave and can perform household chores with periods of rest. Mr. Davidson can do laundry, drive a car, and go shopping at stores. He is capable of managing his finances. He also reported that he will "go out in my garage and mess around. Can't do too much out there." (*Id.*)

## II. DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Mr. Davidson met the insured status requirement of the Act through March 31, 2014. The ALJ then began the five-step analysis. At step one, the ALJ found that Mr. Davidson has not engaged in substantial gainful activity since January 30, 2009, the alleged onset date of disability. The ALJ found that Mr. Davidson worked after the alleged disability onset date but that his work activity did not rise to the level of substantial gainful activity. At step two, the ALJ found that Mr. Davidson has the following severe impairments: degenerative disc disease in the lumbar and cervical spine, degenerative joint disease in the right shoulder, depression, anxiety, and alcohol dependence. At step three, the ALJ concluded that Mr. Davidson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Mr. Davidson has an RFC to perform light work with the following limitations: "he can lift/carry 20 pounds occasionally and 10 pounds frequently. He can sit for 6 hours total in a workday and stand/walk for 6 hours total in a workday. He must be allowed a sit/stand option at his workstation and can occasionally push or pull with the left upper extremity, but never push or pull with the right upper extremity. He can occasionally reach overhead with the left upper extremity and never reach overhead with the right upper extremity. He must avoid concentrated exposure to extreme cold, extreme heat, humidity, wetness, and vibrations. In addition, he must avoid work at unprotected heights. The claimant has the mental capacity to perform simple and repetitive tasks that requires only superficial interaction with coworkers and the general public." (Filing No. 15-2 at 21.)

At step four, the ALJ determined that Mr. Davidson is unable to perform his past relevant work as a painter as he actually performed it, and as it generally is performed, because that work is generally performed at the medium exertional level, and Mr. Davidson's RFC was limited to light work with some limitations. At step five, the ALJ determined that Mr. Davidson is not disabled because there are jobs that exist in significant numbers in the national economy that Mr. Davidson could perform with his RFC of light work with some limitations. The ALJ denied Mr. Davidson's applications for DIB and SSI because of the determination that Mr. Davidson is not disabled.

## IV.  DISCUSSION

In his request for judicial review, Mr. Davidson asserts that the ALJ erred (1) in determining his RFC because the RFC did not incorporate all of Mr. Davidson's limitations, (2) by improperly assessing Mr. Davidson's subjective complaints of pain and failing to incorporate

13

those complaints in the RFC, and (3) by failing to determine the effect of Mr. Davidson's obesity on his ability to work.

Regarding this last contention of error, Mr. Davidson does not present any supporting argument or evidence regarding obesity, and the record evidence shows that Mr. Davidson is about 5'7" and fluctuates between about 120 and 150 pounds. Mr. Davidson is not obese, and he provides no argument for this alleged error committed by the ALJ. The Court finds no error based on obesity and determines that Mr. Davidson has waived this basis for error by failing to develop any cogent legal argument.

Mr. Davidson argues that the ALJ erred in his RFC assessment because the determination must consider a claimants ability to hold employment and perform work-related activities over time. He asserts that the ALJ improperly found that he could "perform the demands of light work and did not specifically state any non-exertional impairments or pain limitations." ([Filing No. 21 at 6](#).) Mr. Davidson asserts that light work requires the ability to walk or stand for six hours a day. Then Mr. Davidson simply provides an almost verbatim regurgitation of the "medical evidence" section of his brief and then in a conclusory manner asserts that the medical evidence shows greater limitations than those incorporated in the RFC.

Mr. Davidson essentially asks this Court to reweigh the evidence and substitute its judgment for the ALJ's decision regarding his RFC. But this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman*, 546 F.3d at 462. After reviewing the ALJ's decision, it is clear that the ALJ considered all the medical and non-medical evidence presented and the testimony given at the hearing in determining Mr. Davidson's RFC.

The ALJ explained his review of the numerous MRIs, x-rays, EMG tests, treatment notes, and opinions of medical professionals. He explained why he gave varying degrees of weight to

those opinions. He considered Mr. Davidson's testimony during the hearing and his testimony to his medical providers. The ALJ adequately addressed each of the lines of evidence that were presented. The ALJ explained why he decided to give weight to the opinions of testifying medical expert Dr. Hutson and vocational expert Mr. Burger. Then, based on his review of the entire record, the ALJ determined that an RFC of light work was appropriate, but only with specific, additional limitations to account for Mr. Davidson's complaints of pain and other impairments. The ALJ's RFC determination was supported by substantial evidence, and he did not err in assessing a light work RFC with additional limitations.

Mr. Davidson next argues that the ALJ did not determine (1) whether his subjective complaints of pain could be expected to result from his objectively demonstrated physical impairments, and (2) what effect his pain could have on his ability to work ([Filing No. 21 at 10](Filing No. 21 at 10)). Immediately after beginning this argument, Mr. Davidson acknowledges—by quoting the ALJ's decision—that the ALJ did determine whether Mr. Davidson's subjective complaints of pain could be expected to result from his objectively demonstrated physical impairments ([Filing No. 21 at 11](Filing No. 21 at 11)). The ALJ did find that Mr. Davidson's impairments could be expected to produce his pain. But the ALJ then found that the intensity, persistence, and limiting effect of his pain was not as severe as Mr. Davidson presented—a credibility determination.

Mr. Davidson simply does not agree with the ALJ's determination of his credibility. Mr. Davidson invites the Court to reweigh the evidence regarding the impact of his pain on his ability to work. He again provides an almost verbatim regurgitation of the "medical evidence" section of his brief and then asserts that the ALJ failed to include non-exertional limitations in the RFC.

The Court must determine whether the ALJ's credibility finding was "patently wrong," *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000), meaning that it "lacks any explanation or

support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). Upon review of the ALJ's decision, the testimony provided at the administrative hearing, and the record evidence, the Court holds that the ALJ's credibility decision and the weight he gave to the testimony regarding the intensity, persistence, and limiting effect of Mr. Davidson's pain were supported by the evidence and testimony, and therefore were not patently wrong. The ALJ relied on the opinions of testifying medical expert Dr. Hutson and vocational expert Mr. Burger to find that Mr. Davidson's physical impairments produced several functional limitations, but he could nonetheless perform jobs such as inspector, mail clerk, and hand packager. The ALJ explained that Mr. Davidson's subjective allegations were not entirely credible in light of the absence of negative clinical findings, the relative effectiveness of pain medication and injections, Mr. Davidson's failure to follow through with physical therapy, and his exaggeration of the effects of his mental impairments. The ALJ relied on numerous reports from various treating medical professionals that noted Mr. Davidson's functions were within normal limitations and were intact.

The ALJ did not err in discounting Mr. Davidson's claim of greater intensity, persistence, and limiting effect of his pain on his ability to work. The ALJ did not entirely ignore Mr. Davidson's subjective complaints of pain. He accounted for Mr. Davidson's pain by assigning him a light work RFC with additional very specific limitations. Then, after presenting those limitations to Mr. Burger, the vocational expert, the ALJ determined that Mr. Davidson could not return to his previous work as a painter, but he could perform other work that existed in significant number in the national economy.

The ALJ addressed the weight he gave to each of the expert and non-expert opinions and the reasons for his decisions. The ALJ's determinations were supported by sufficient evidence, and any contrary evidence was adequately considered and addressed. Having determined that Mr.

Davidson has an RFC to perform work that exists in significant number in the national economy, the ALJ reasonably concluded that Mr. Davidson is not disabled.

## V. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Mr. Davidson's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 3/31/2015

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kelie C. Schneider
DALEY DISABILITY LAW
kelie.schneider@gmail.com

Frederick J. Daley, Jr.
DALEY DISABILITY LAW P.C.
fdaley@fdaleylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov